# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### August 23, 2011 Session

## PATRICIA CARLENE MAYFIELD v. PHILLIP HAROLD MAYFIELD

**Appeal from the Circuit Court for Warren County**
**No. 3241     Hon. Larry B. Stanley, Jr., Judge**

---

**No. M2010-01383-COA-R3-CV - Filed January 17, 2012**

---

In this case, Patricia Carlene Mayfield ("Wife") sought a divorce from Phillip Harold Mayfield ("Husband"). The parties had two minor children, a daughter ("Daughter"), born on September 10, 1998, and a son ("Son"), born on March 2, 2001. The trial court granted the divorce and designated Wife as the primary residential parent of the two minor children, divided the marital property, and awarded Wife discretionary costs. The court denied Husband's request for alimony. Husband appeals. We affirm in part and reverse in part. The case is remanded to the trial court for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed in Part, Affirmed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

Thomas F. Bloom, Nashville, Tennessee, for the appellant, Phillip Harold Mayfield.

Amy J. Farrar, Nashville, Tennessee, for the appellee, Patricia Carlene Mayfield.

### OPINION

### I. BACKGROUND

The parties met while Wife was attending pharmacy school and Husband was working as a maintenance machinist in the tool and die industry. Wife's parents paid for the majority of her schooling until they learned of Wife's relationship with Husband. When Wife's parents ceased payment for Wife's schooling, Husband paid $10,000 for Wife's final

semester with funds he obtained as a result of a worker's compensation settlement agreement. Upon Wife's graduation and receipt of her doctorate in pharmacy in 1989, Wife began working full-time at Stewart's Pharmacy and moved in with Husband. Wife immediately began making Husband's house and land payments for his family property and farming business. At that time, Husband worked for Quality Mold Shop, Incorporated, a tool and die machine shop, and had plans to grow the farming business. Shortly thereafter, Husband lost his job and focused his efforts on the farming business. On August 22, 1992, the parties were married. In 1995, Wife began working for Wal-Mart as a staff pharmacist and eventually received a promotion in the form of a managerial position. She testified that she was given the opportunity to become a district area manager but that she refused the promotion at Husband's request.

Wife said that she lived with Husband in a small house on the Mayfield property. The house consisted of two bedrooms, one bathroom, a kitchen, and a combined living and dining area. The only source of heat in the house was a wooden insert in the fireplace. She said that Husband promised they would build a bigger house, but he never fulfilled his promise. Additionally, Husband never found full-time employment. She admitted that when they decided to start a family, they agreed that Husband would stay home and care for the children while working on the farm. She claimed that while Husband stayed home with the children and was tasked with running the farm, Husband hired others to complete the chores on the farm. She alleged that she cared for the children when she was home and that she did the shopping, laundry, cleaning, hauling wood, and cooking.

Wife testified that in April 2007, Husband began to physically abuse her. She recounted numerous instances of physical abuse that need not be recounted in exhaustive detail. Generally, Husband would hit or slap her and would "grind" and "twist[]" his heels into her feet, causing significant bruising. On specific occasions, Husband "busted [her] nose so bad [that she] couldn't swallow," pointed a rifle or shotgun at her, and threatened to put her car in park while she was driving.

Wife left Husband after a specific incident in January 2008. On that day, Husband stripped most of her clothes off and threw her outside, where he assaulted her further. Husband eventually brought her back into the house, where he continued the assault. She said that she went to work the next day but that Husband called her repeatedly. In one conversation, she asked him if he would hurt her when she returned home, and he replied by stating, "We'll wait until you get home, and we'll see."[1] Scared of returning home, she

---

[1] Jeanine Masters, Wife's co-worker, testified that she overhead Husband threaten Wife during this conversation.

retrieved the children before hiding in a motel for a few days. She then moved into a two-bedroom apartment with the children.

After Wife left Husband, they shared visitation with the children according to an agreed visitation schedule, with Wife and Husband alternating weeks caring for the children. In March 2008, Wife met Husband to retrieve the children following one such visit. In the midst of an argument, Husband threw Wife to the ground. Mrs. Gribble, who lived near Husband and was present for the exchange of the children, testified that she observed Husband grab Wife and throw her to the ground, injuring Wife's finger in the process.[2] Wife went to the doctor's office, where she learned that her thumb had been fractured. In January 2009, Wife filed for divorce.

At the divorce hearing, Wife testified that the abuse began after Husband became upset about the hours that she worked and the fact that she worked with men. She said that Husband was generally compliant with her initial acceptance of the position at Wal-Mart as a staff pharmacist and that he was also compliant with her promotion to manager. She related that among the other problems in the marriage, she was unsatisfied with Husband's lack of employment and the lack of success with the farm. She asserted that Husband assured her that the farming operation would be profitable in time but that the business never grew, despite her repeated investment in the venture. She claimed that she assisted him with several land purchases and opined that he sought to purchase all of the land around the farm. While he received some money from the farming operation, he never shared that money with her. Additionally, she alleged that he took money from her and insisted that he see her paychecks before she cashed them.

Wife claimed that in 2006, Husband cashed an approximately $4,000 check that she received from the sale of her stock and that in 2008, he took their 2007 tax refund of $12,500 without giving her any of the proceeds. She said that when she filed for divorce, Husband sold "60 head of cattle for $10,000," which she believed was a reduced price, and never remitted any of the money to her. She admitted that when she left, she took $22,000 out of the checking account. She explained that she had to buy new clothing and essentials to start her new life. She also admitted that of her income from January 2008 until the time of the divorce proceeding, she only gave Husband $500. However, she asserted that she continued making the payments for the land and Husband's vehicle even though they were separated.

---

[2]Mrs. Gribble also testified that after the March incident, Husband blew his horn and laughed at her whenever he drove by her on the road. On another occasion, he was standing by his car on the side of the road when she was driving home. When he saw her, he laughed, danced, pointed at her, and pretended to throw his hat at her as she drove by him.

Relative to the custody arrangement for the children, Wife argued that designating her as the primary residential parent and awarding her more parenting time than Husband would be in the best interest of the children. She opined that she was better equipped to deal with Son's medical condition,[3] that Daughter needed her support because Daughter was going through puberty, that she was planning to build a home for her and the children, that she had the ability and was willing to provide a college education for the children, and that Husband refused to allow the children to participate in their extracurricular activities.

Wife's mother ("Mrs. Crawford") testified that she lived near Husband and Wife. Mrs. Crawford believed that Husband refused to work, while Wife supported the family throughout the marriage. She stated that after Husband and Wife were married for quite some time, she noticed that Wife had bruises on different parts of her body, including her feet.[4] Wife told her that Husband had caused the bruises on her feet. In December 2007, she confronted Husband about the abuse, and he told her that Wife could leave after Wife paid for all of the land.

Relative to Wife's life with the children after Wife left Husband, Mrs. Crawford testified that the children were happy and well-adjusted in the new apartment. She said that the children never invited their friends to the Mayfield house but that their friends visited them at the new apartment. She admitted that Wife worked long hours but insisted that she cared for the children when Wife worked late. She claimed that when she could not care for the children while Wife worked, Wife hired a "real respectable baby-sitter that ha[d] been checked out."

Lisa Turner, a Department of Children's Services family support worker, testified that she was assigned to the Mayfield case after the children were alleged to be dependent and neglected following Husband's failure to give Son prescribed medication for Son's life-threatening medical condition.[5] She testified that she visited the children at Wife's residence on several occasions and that while she attempted to visit the children at Husband's residence, she was unable to coordinate with Husband. She claimed that Husband was also not present for the child family team meetings. She admitted that Husband returned one of her telephone calls and told her that she could visit the children at his mother's house. She

---

[3]Robert Steiner, a physician's assistant in McMinnville, Tennessee, testified that Son had a heart condition and that Husband failed to give Son his prescribed medication for an entire week.

[4]Mrs. Gribble testified that she observed Wife's bruises. Kim Hillis, Becky Stewart, and Mrs. Masters, Wife's co-workers, also testified that they observed Wife's bruises.

[5]There was also an allegation that Husband showed Daughter a nude photograph of Wife; however, Daughter stated that she found the photograph while looking through the pictures on Husband's cellular telephone.

also admitted that Husband brought the children to her office to meet with her. She related that during the visits at Wife's residence, the children were excited to see her, "very comfortable," and "very relaxed." She observed a "loving relationship" between the children and Wife. In contrast, she stated that when she visited the children at Husband's mother's residence, Son was "not himself." Additionally, Daughter was pushed by Husband and Husband's mother to relate potentially damaging information about Wife to her. She found the allegations against Wife to be without merit.

Relative to his employment during the marriage, Husband said that he and Wife agreed that he would stay at home with the children and continue farming. He contended that he did the majority of the cooking, cleaning, and laundry and that he cared for the children and took them to school. He also managed all of land that he and Wife purchased throughout their marriage. He asserted that Wife was never home once she became a manager at Wal-Mart. He claimed that he simply wanted Wife to "work a few hours and come home and hang out with the kids."

Relative to the children, Husband testified that they had never spent the night away from home until Wife left him. He said that the current visitation schedule was not his preference and that he would prefer to "have them all the time" or at least during the week when Wife was working. He suggested that the children were adjusting well to the every other week visitation schedule, despite his preference for more time with them.

Husband testified that since the separation, he had been unable to secure full-time employment outside of the farm, despite his best efforts. He said that he had not worked in the tool and die industry since 1989 and that he had not maintained his knowledge of the industry. He claimed that the work was more "automated" than it had been in 1989 and required specialized computer training. He said that he had been working with hay and cattle on the farm since 1989.

Rodney Caldwell, a vocational expert, testified that Husband had gained transferrable skills from his work in the tool and die industry and from his work on the farm. He claimed that Husband was capable of obtaining a job available in either field. Husband's brother-in-law ("Mr. Bonner") testified that he worked in the tool and die industry. Mr. Bonner said that Husband would have a hard time returning to the field because "everything ha[d] just about gone to computers." He suggested that in order to return to the field, Husband would have to "go back to school and learn a few things." He claimed that Husband's advanced age would also hinder any efforts of returning to the field.

Daughter testified[6] that her father woke her up in the morning, helped her get ready for school, took her to school, picked her up from school in the afternoon, cooked dinner, cleaned the house, washed the clothes, helped her with her homework, and helped her get ready for bed at night. She said that in the summer, her father watched her play outside, took her to church, and took her to softball practice. She stated that her mother also cared for her and took her places when her mother was not working. She admitted that at times, she would not see her mother all day because she was in bed when her mother returned home. She said that she enjoyed living in the new apartment. She claimed that when she visited her father, he took her cellular telephone away from her. She explained that her father told her that it was "not fair" that she was allowed to call her mother when she was not allowed to call him. She admitted that her father also caught her sending a text message to a boy late one night.

Following the presentation of the above evidence, the trial court awarded Wife a divorce on the ground of inappropriate marital conduct, finding that there was "overwhelming evidence that [Wife] was subjected to domestic abuse that was on occasion severe physical abuse." The court then divided the marital property. The court denied Husband's request for alimony, finding that Husband was "willfully underemployed" and capable of finding employment outside of the farm. The court imputed an earning capacity of $45,000 a year upon Husband and noted that each party was "physically and mentally capable to provide for themselves after the divorce." The court also considered Husband's fault in the divorce and his presentation of inconsistent testimony at trial, in depositions, and in interrogatories as reasons for denying the request for alimony. Relative to the children, the court designated Wife as the primary residential parent, set a visitation schedule, and ordered Husband to pay child support.

Wife filed a motion to alter or amend the order, requesting, among other things, discretionary costs and attorney fees. Husband filed a motion to alter or amend the order, requesting, among other things, a division of Wife's post-separation income earned in 2008 and 2009. Wife filed a motion to suspend Husband's visitation with Daughter, with an attached affidavit from Daughter describing an incident between Husband and Daughter.

In consideration of the motions, the court granted Wife's request for discretionary costs, awarded Wife the entirety of her 2008 and 2009 post-separation income, and suspended Husband's visitation with daughter. The court denied Wife's request for attorney fees. Following additional motions to alter or amend, the court entered a subsequent order in which it modified the parenting plan, awarding Husband with 136 days of visitation with Son but prohibiting any visitation time with Daughter, citing the incident in which Husband

---

[6]Daughter's testimony was taken in the trial court's chambers with attorneys for both sides present.

assaulted Daughter.[7]  In consideration of this change, the court recalculated the amount of child support owed by Husband.  This timely appeal followed.

## II.  ISSUES

We consolidate and restate Husband's issues on appeal as follows:

A.  Whether the trial court erred in dividing the marital property.

B.  Whether the trial court erred in determining the custody arrangement.

C.  Whether the trial court erred in denying Husband's request for alimony.

D.  Whether the trial court erred in granting Wife's request for discretionary costs.

## III.  STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them.  *See* Tenn. R. App. P. 13(d).  The trial court's conclusions of law are subject to a de novo review with no presumption of correctness.  *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal."  *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

## IV.  DISCUSSION

### A.

Husband contends that the trial court erred in failing to divide Wife's post-separation income.  Husband acknowledges that the court was not required to divide the post-separation earnings equally but asserts that the court's decision to award Wife the entirety of her post-separation income was inequitable.  Wife responds that Husband's argument should be dismissed because his table listing all marital property subject to division did not conform

---

[7]The court recognized that it had intended to award Husband 136 days of visitation with the children but that the initial parenting plan contained a calculation error providing for only 108 days of visitation.

to Rule 7 of the Rules of the Court of Appeals. In the alternative, Wife responds that the trial court did not err in distributing the marital property given Wife's continued support of Husband while they were separated and Husband's dissipation of assets and refusal to find suitable employment.

As a threshold matter, we must first determine whether Husband complied with Rule 7 of the of the Rules of the Court of Appeals, which provides,

> (a) In any domestic relations appeal in which either party takes issue with the classification of property or debt with the manner in which the trial court divided or allocated the marital property or debt, the brief of the party raising the issue shall contain, in the statement of facts or in an appendix, a table in a form substantially similar to the form attached hereto. This table shall list all property and debts considered by the trial court, including: (1) all separate property, (2) all marital property, and (3) all separate and marital debts.

> (b) Each entry in the table must include a citation to the record where each party's evidence regarding the classification or valuation of the property or debt can be found and a citation to the record where the trial court's decision regarding the classification, valuation, division, or allocation of the property or debt can be found.

> (c) If counsel disagrees with any entry in the opposing counsel's table, counsel must include in his or her brief, or in a reply brief if the issue was raised by opposing counsel after counsel filed his or her initial brief, a similar table containing counsel's version of the facts.

Having reviewed Husband's table, we acknowledge that the table contained some errors in the court's classification and valuation of certain items and did not contain sufficient citations to the record. However, we do not believe that these errors merit a refusal to consider the issue on appeal in this case. *See generally Bean v. Bean*, 40 S.W.3d 52, 54 (Tenn. Ct. App. 2000) (dismissing the case for failure to follow the appellate rules but stating that "[f]or good cause, [the appellate court] may suspend the requirements of [the rules] in a given case").

From our review of the record, we believe that the following table accounts for the court's classification and division of the property found to have monetary value:

*Separate property*

| Property | Value found by trial court | Awarded to |
|---|---|---|
| 1. Wachovia account | $16,000 | Wife |

*Marital property*

| Property | Value found by trial court | Awarded to |
|---|---|---|
| 1. 31.1 acres | $115,000 | Husband |
| 2. 2007 tax refund | $12,500 | Husband |
| 3. Cattle and farm equipment | $50,000 | Husband |
| 4. Wal-Mart stock check | $4,000 | Husband |
| 5. Security Federal Savings | $1,567 | Husband |
| 6. Wife's 401(k) | $19,000 | Husband |
| 7. 18 and 19 acre tracts | $86,000 | Wife |
| 8. Wal-Mart stock check | $2,700 | Wife |
| 9. Security Federal Savings | $22,000 | Wife |
| 10. Wife's 401(k) | $153,000 | Wife[8] |

In distributing the marital property, the court noted that its division of marital property accounted for the fact that Wife "continued to make the monthly payments on the real property, house, and [H]usband's truck" following the separation.

The trial court originally awarded additional amounts to Husband and Wife accounting for the proceeds obtained from an auction of marital items and the sale of a truck. However, following the filing of motions to alter or amend, the court awarded Husband the entirety of the proceeds from the auction because the funds obtained from the sale of the truck were immediately remitted to the lienholder. The court deducted Wife's discretionary costs from this amount, thereby awarding Husband an additional $34,377.83. The court also awarded Wife the entirety of her post-separation income in 2008 and 2009, the 2008 tax refund, and her 2009 bonus. Monetary values were not assigned to the 2008 tax refund or the 2009 bonus as these amounts were not known; however, testimony from the trial reflects

---

[8]As discussed, further in this opinion, this table does not account for the amounts originally awarded to Husband for the GMC truck and the proceeds of the auction or the amount originally awarded to Wife for the remainder of the proceeds of the auction.

that Wife earned $156,000 in 2008 and $127,283 by the time of the trial in 2009. Thus, of a marital estate valued at approximately $783,427.83, Husband received approximately $236,444.83, while Wife received approximately $546,983.

On appeal, the trial court's classification and division of property is reviewed de novo with a presumption that the trial court's factual findings are correct. *See Watters v. Watters*, 959 S.W.2d 585, 588 (Tenn. Ct. App. 1997). Absent an error of law, the court's classification and subsequent division of property will be reversed or modified only if the evidence preponderates against the court's decision. *Id.* The trial court has wide discretion in classifying and dividing property. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998). This court must give great weight to the trial court's decisions in dividing marital assets, and "'we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)).

Because Tennessee is a "dual property" state, a trial court must identify all of the assets possessed by the divorcing parties as either separate or marital property before dividing the marital estate. *See generally* Tenn. Code Ann. § 36-4-121(a)(1); *see Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009). Separate property is not part of the marital estate and is therefore not subject to division. *See Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). Separate property is defined, in part, as "[a]ll real and person property owned by a spouse before marriage . . . ." Tenn. Code Ann. § 36-4-121(b)(2). In contrast, "marital property includes all property owned as of the date of the filing of the complaint for divorce or acquired up to the date of the final divorce hearing." *Larsen-Ball v. Ball*, 301 S.W.3d 228, 233 (Tenn. 2010); *see* Tenn. Code Ann. § 36-4-121(b)(1). The classification of property as either marital or separate property is a question of fact for the trial court. *Mitts v. Mitts*, 39 S.W.3d 142, 144-45 (Tenn. Ct. App. 2000).

Once the trial court has designated the property as separate or marital, the court must divide the property equitably - without regard to fault - pursuant to the factors listed in Tennessee Code Annotated section 36-4-121. *See Jolly v. Jolly*, 130 S.W.3d 783, 785 (Tenn. 2004). The trial court is under no obligation to divide the marital property equally, but rather equitably, for "[t]he division of the estate is not rendered inequitable simply because it is not mathematically equal or because each party did not receive a share of every item of marital property." *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998) (citations omitted).

Following our review, we first conclude that the trial court's classification of property as either marital or separate property was appropriate. Thus, in this case, we are tasked with reviewing the distribution of the marital property following the end of an approximately 17-year marriage in which Husband agreed to contribute to the marriage as a homemaker, while Wife steadily improved in her career and potential earning capacity. Having reviewed the factors outlined in Tennessee Code Annotated section 36-4-121(c), we conclude that the evidence preponderates against the court's decision regarding the division of the marital property.

Specifically, we take issue with the court's refusal to divide Wife's post-separation income earned in 2008 and 2009. We believe this income was marital property subject to division. Indeed, any income earned until the filing of the final decree of divorce was subject to division and should have been considered in the court's initial order dividing the marital property. *Larsen-Ball*, 301 S.W.3d at 233. While the court recognized this fact in its subsequent order, the court awarded the entirety of the post-separation income to Wife. We acknowledge that the court was not obligated to divide every piece of marital property between the parties; however, the court's refusal to divide the post-separation income resulted in an inequitable distribution of the marital estate. Accordingly, we remand this case to the trial court for the division and distribution of Wife's post-separation income. Upon remand, the court should determine the amount of Wife's reasonable moving and living expenses during the relevant time period and deduct that amount from her post-separation earnings from 2008 until November 10, 2009, the date of the final decree of divorce. Wife should retain 54.2 percent of the remaining amount, while Husband should be awarded 45.8 percent of the remaining amount. Wife should also retain the 2008 tax refund and her 2009 bonus. We believe that this division accurately reflects each party's contribution to the approximately 17-year marriage and the relative economic position of each party following the separation. *See* Tenn. Code Ann. § 36-4-121(c).

B.

Husband contends that the trial court erred in designating Wife as the primary residential parent of the two minor children and in setting the visitation schedule. Husband asserts that the court's parenting plan adversely impacted Daughter's relationship with him, resulting in the subsequent suspension of his visitation. Husband requests a modification of the parenting plan so as to award him visitation with the children during the week and to award Wife visitation with the children on the weekend when Wife is not working. Husband claims that such a visitation schedule would "most approximate the schedule under which the children have lived for their entire lives and under which they have flourished." Wife responds that the court's reduction of Husband's visitation was supported by the record. She alternatively asserts that Husband's visitation time with Son should be decreased.

In designating Wife as primary residential parent and setting the visitation schedule, the court stated,

> Both parents are able to feed, clothe, and care for the basic needs of the children. [Wife] is in a position to provide the children with educational help that [Husband cannot]. [Wife] is also more capable of providing financial support for the children. The physical abuse of [Husband] toward [Wife] caused her relocation from the family home. Both parents have support from their families [and both] are physically able to care for the children. The [c]ourt specifically finds, pursuant to Tennessee Code Annotated [section] 36-6-106(8), that there is clear and substantial evidence of physical and emotional abuse of [Husband] toward [Wife]. At least one of these instances of abuse occurred in the presence of the children. There is evidence in the record that [Husband] may be unwilling to assist [Daughter] in certain extra-curricular activities. Therefore, the [c]ourt finds by clear and convincing evidence that from all of the proof in this case, and for the reasons stated in this order, that the attached parenting plan is in the best interest of the parties' minor children.

Following the court's order, Wife submitted a motion to suspend Husband's visitation in which she attached an affidavit from Daughter. In the affidavit, Daughter wrote,

> That when I was picked up for visitation by my father after school on January 14, 2010, he took me home and engaged in a series of actions against me. He struck me a number of times with a plastic track which he used as a stick or bat. He struck me a number of times leaving marks on my leg and shoulder. Further, that he slapped me once hard across the face and held my head into the sink while pulling my hair and additionally spit in my face. The next morning, January 15, 2010, he struck me again with the plastic tracking. All of these actions were in response to my writing him a letter telling him that I did not want to visit at the time and further regarding a cell phone.

> I am fearful of what he may [do] to [me] if I go home with him again on January 15, 2010. It is my strong desire to stay either with my mother or grandmother until a hearing can be arranged for some other type of visitation.

Following the filing of the motion, the court suspended Husband's visitation with Daughter. A new parenting plan was filed which reflected the change in Daughter's visitation with Husband. The court instructed the parties that the suspension of visitation could be reviewed within 60 days; neither party requested a review of the decision prior to the filing of the appeal.

Trial courts have broad discretion to fashion parenting plans that best suit the unique circumstances of each case. *See Parker v. Parker*, 986 S.W.2d 557, 563 (Tenn. 1999). "Because '[c]ustody and visitation determinations often hinge on subtle factors, including the parents' demeanor and credibility during the divorce proceedings themselves,' appellate courts 'are reluctant to second-guess a trial court's decisions.'" *Johnson v. Johnson*, 165 S.W.3d 640, 645 (Tenn. Ct. App. 2004) (quoting *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996)). Thus, appellate courts should only set aside the trial court's judgment in such cases when it "falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001).

The trial court must make its decision regarding the custody of a child in accordance with the best interest of the child. Tenn. Code Ann. § 36-6-106(a). In making its decision, the court must consider the following factors:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in [section] 39-15-401 or [section] 39-15-402, or child sexual abuse, as defined in [section] 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers;

(6) The home, school and community record of the child;

(7)(A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in [section] 39-15-401 or [section] 39-15-402, or child sexual abuse, as defined in [section] 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child.

Tenn. Code Ann. § 36-6-106(a)(1)-(10). In setting the residential schedule, the court is instructed to consider,

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

-14-

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with these schedules; and

(16) Any other factors deemed relevant by the court.

Tenn. Code Ann. § 36-6-404(b).

Recognizing the court's broad discretion on this matter, we believe that the record supports the trial court's decision on the designation of Wife as the primary residential parent and on the setting of the visitation schedule. Husband's prolonged abuse of Wife was of particular importance in this case. Additionally, Daughter's affidavit accounting for her estranged relationship with Husband and his alleged abuse against her was also an extremely important factor. There was also evidence that Husband failed to ensure that Son received his medication for a life-threatening medical condition. While there was no evidence that Son did not enjoy a relatively healthy relationship with Husband, witnesses testified that both children enjoyed a good relationship with Wife, despite her work schedule. Wife was better equipped to deal with Son's medical condition and provide for the children. There was also evidence that there were attempts by Husband to interfere with Daughter's relationship with Wife. With all of these considerations in mind, we conclude that the trial court's decision did not "fall[] outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88. Accordingly, we affirm the court's designation of Wife as the primary residential parent and the court's structuring of the residential schedule. Despite Wife's request, we decline to reduce Husband's parenting time with Son.

C.

Husband contends that the trial court abused its discretion in failing to award rehabilitative alimony because his agreement and willingness to care for the children while Wife advanced in her career resulted in his prolonged absence from the workforce and inability to secure employment. Husband asserts that he is also entitled to "an in futuro award" to compensate for the tremendous disparity in his earning capacity. Wife responds that the trial court did not abuse its discretion in denying Husband's request for alimony. Wife asserts that Husband, who possessed transferrable job skills, is fully capable of finding suitable employment or continuing with his farming operation. Wife notes that Husband was unsupportive of her career, abusive, and willfully underemployed and should not be rewarded for his refusal to secure full-time employment.

Trial courts have broad discretion in awarding spousal support. *Bratton v. Bratton*, 136 S.W.3d 595, 605 (Tenn. 2004). "Accordingly, '[a]ppellate courts are generally disinclined to second-guess a trial judge's spousal support decision unless it is not supported by the evidence or is contrary to the public policies reflected in the applicable statutes.'" *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001) (quoting *Kinard v. Kinard*, 986 S.W.2d

220, 234 (Tenn. Ct. App. 1998)). The role of an appellate court in reviewing an award of spousal support is to determine whether the trial court applied the correct legal standard and reached a decision that is not clearly unreasonable. *Id.* at 733. Thus, an appellate court must review a trial court's decision regarding alimony using the deferential abuse of discretion standard. *See Bratton*, 136 S.W.3d at 605. If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

"Alimony" is defined, in pertinent part, by Black's Law Dictionary, 9th ed., as

> [a] court-ordered allowance that one spouse pays to the other spouse for maintenance and support . . . after they are divorced. Alimony is distinct from a property settlement.

In determining whether to award alimony, the court must first consider whether the spouse seeking alimony is economically disadvantaged. *Perry v. Perry*, 114 S.W.3d 465, 467 (Tenn. 2003). "Once the trial court has found a party to be economically disadvantaged relative to his or her spouse, it must determine the nature, amount, length of term, and manner of payment of the award." *Id.* at 467.

In addition to the factors found in Tennessee Code Annotated section 36-5-121(i), the two most relevant factors in determining the amount of alimony awarded are the economically disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson v. Robertson*, 76 S.W.3d 337, 342 (Tenn. 2002). When considering these two factors, the primary consideration is the disadvantaged spouse's need. *Aaron*, 909 S.W.2d at 410; *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999).

Tennessee recognizes four different types of alimony: rehabilitative alimony, transitional alimony, alimony in futuro, and alimony in solido. Each type addresses a specific need. Rehabilitative alimony is temporary support intended to assist the economically disadvantaged spouse in obtaining the education or training necessary to allow him or her to achieve a reasonable standard of living in comparison to the standard of living maintained by the parties during the marriage, or to the post-divorce standard of living available to the other spouse. Tenn. Code Ann. § 36-5-121(e)(1). Where rehabilitation is not necessary, transitional alimony may be awarded to assist the disadvantaged spouse in adjusting to the economic consequences of the divorce. Tenn. Code Ann. § 36-5-121(g)(1). Alimony in

futuro and alimony in solido are long term forms of spousal support. Tenn. Code Ann. § 36-5-121(f)(1), (h)(1). Alimony in futuro is typically awarded when a spouse is economically disadvantaged, but rehabilitation is not feasible, meaning that the disadvantaged spouse cannot achieve an earning capacity that will allow him or her to maintain an appropriate standard of living. Tenn. Code Ann. § 36-5-121(f)(1). This type of alimony is awarded on a "long term basis or until death or remarriage of the recipient" spouse. *Id.* Alimony in solido, on the other hand, is a lump sum award of alimony, but it may be paid in installments over a specific period of time. Tenn. Code Ann. § 36-5-121(h)(1). Courts typically award this type of alimony to adjust the division of marital property. *Burlew v. Burlew*, 40 S.W.3d 465, 471 (Tenn. 2001). Alimony in solido may also be awarded to assist the disadvantaged spouse in paying attorney's fees. *Koja v. Koja*, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000).

"There are no hard and fast rules for spousal support decisions, and such determinations require a 'careful balancing' of the relevant factors." *Miller v. Miller*, No. M2002-02731-COA-R3-CV, 2003 WL 22938950, at *3 (Tenn. Ct. App. Dec. 10, 2003) (citing *Anderton v. Anderton*, 988 S.W.2d 675, 682-83 (Tenn. Ct. App. 1998)). Courts must also take into consideration the different roles a spouse may have in a marriage when considering an award of alimony. Tenn. Code Ann. § 36-5-121(c). "[T]he contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage." Tenn. Code Ann. § 36-5-121(c)(2). "Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, . . . the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties." Tenn. Code Ann. § 36-5-121(c)(2). The courts must consider the standard of living during the marriage and post-divorce where one spouse, as the homemaker or parent, has concentrated his or her efforts on the family, while the other spouse has followed a career. *Jackson v. Jackson*, No. W2006-00182-COA-R3-CV, 2007 WL 529928, at *8 (Tenn. Ct. App. Feb. 22, 2007), *perm. app. denied* (Tenn. Aug. 13, 2007); *see also Morrow v. Morrow*, No. M2003-02448-COA-R3-CV, 2005 WL 1656825, at *8 (Tenn. Ct. App. July 14, 2005).

From our review of the record, we believe that the trial court did not err in refusing to award rehabilitative alimony or alimony in futuro. An award of rehabilitative alimony would be inappropriate because Husband is fully capable of finding suitable employment utilizing his skills in farming or in the tool and die industry. Likewise, an award of alimony in futuro would be inappropriate because Husband is fully capable of achieving an earning capacity that will allow him to maintain an appropriate standard of living. However, in this case, Husband remained at home caring for the children while Wife advanced in her career.

Daughter confirmed Husband's testimony that he performed the majority of the household duties while Wife focused on her career. Given this fact, we conclude that the trial court's *complete* rejection of all forms of alimony was clearly unreasonable given the unique circumstances of the case. We believe that Husband suffered an economic detriment for the benefit of the marriage and is entitled to transitional alimony. In setting the amount, we note that the standard of living enjoyed during the marriage was relatively modest. Indeed, the parties lived in a small house and at Husband's request, invested in land instead of enjoying a higher standard of living. Additionally, Husband was awarded a fair amount of the land acquired during the marriage, and, we, like the trial court, cannot discount Husband's fault in the divorce. *See* Tenn. Code Ann. § 36-5-121(i)(11). While Husband's fault should be given great weight, we believe Husband is still entitled to transitional alimony in the amount of $2,000 per month for a period of 36 months. This award should allow Husband adequate time in which to adjust to the economic consequences of the divorce. Accordingly, we reverse the trial court's denial of alimony and remand the case to the trial court with instruction to award Husband alimony as set forth in this opinion.

D.

Husband argues that the trial court erred in awarding Wife discretionary costs and alleges that the award of costs was used to punish him for his abuse of Wife.[9] He asserts that like an award of attorney fees, an award of discretionary costs is inappropriate where the spouse seeking them has adequate income in which to pay his or her costs. Wife responds that unlike attorney fees, discretionary costs are not considered alimony and are not subject to the same rules. Wife contends that the trial court did not abuse its discretion in awarding costs.

When deciding whether to award discretionary costs, a court should

(1) determine whether the party requesting the costs is the 'prevailing party,'

(2) limit awards to the costs specifically identified in the rule,

(3) determine whether the requested costs are necessary and reasonable, and

_____

[9]In his brief, Husband suggests that Wife was also awarded attorney fees. Our review of the record reveals that Wife was merely awarded discretionary costs, not attorney fees.

(4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled.

*Massachusetts Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35-36 (Tenn. Ct. App. 2002). The decision to award costs should not be based on "(1) a desire to punish the losing party, (2) whether the prevailing party is the plaintiff or defendant, or (3) the weight given to a particular witness's testimony." *Id.* at 36. The party seeking such costs has the burden of demonstrating its entitlement to the costs. *Id.* "Pursuant to [R]ule 54.04, trial courts are vested with wide discretion in awarding discretionary costs, and this court will not interfere with such an award except on an affirmative showing that the trial court abused its discretion." *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn. Ct. App. 1998). An award of costs under Rule 54.04(2) is within the trial court's reasonable discretion, and the court may allocate such costs "between the litigants as . . . the equities demand." *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn. 1992); *see Progressive Cas. Ins. Co. v. Chapin*, 243 S.W.3d 553, 561 (Tenn. Ct. App. 2007); *Massachusetts Mut. Life Ins. Co.*, 104 S.W.3d at 35.

In light of such broad discretion, we employ "a deferential standard when reviewing a trial court's decision either to grant or to deny a motion pursuant to this rule." *Smartt v. NHC Healthcare/McMinnville, LLC*, No. M2007-02026-COA-R3-CV, 2009 WL 482475, at *31 (Tenn. Ct. App. Feb. 24, 2009), *perm. app. denied* (Tenn. March 10, 2011); *see also Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 84 (Tenn. Ct. App. 2000). "Because these decisions are discretionary, this [c]ourt is generally disinclined to second-guess a trial court's decision unless the trial court has abused its discretion." *Smartt*, 2009 WL 482475, at *31; *see also Woodlawn Mem'l Park, Inc. v. Keith*, 70 S.W.3d 691, 698 (Tenn. 2002). "[O]n appeal, the appellant bears the burden of showing that the trial court abused its discretion in its assessment of costs." *See Sanders*, 989 S.W.2d at 345.

While we acknowledge that Husband lacks full-time employment and largely depended upon Wife's income for the majority of the marriage, mere inability to pay or indigency is not an "extraordinary matter" warranting review of a trial court's discretionary award of costs. *See Lewis v. Bowers*, 392 S.W.2d 819, 823 (Tenn. 1965). Additionally, we decline to treat an award of discretionary costs similarly to an award of attorney fees. We acknowledge that Wife had the ability to pay her own discretionary costs, but we cannot say that the trial court's imposition of such costs upon Husband constitutes an abuse of discretion. *See Sanders*, 989 S.W.2d at 345; *see Chaffin v. Ellis*, 211 S.W.3d 264, 292 (Tenn. Ct. App. 2006). Likewise, we also conclude that there is no evidence in the record to support

Husband's claim that the trial court's decision to award discretionary costs was based upon a desire to punish Husband for his abuse of Wife. Accordingly, we affirm Wife's award of discretionary costs.

## V. CONCLUSION

The judgment of the trial court is reversed in part and affirmed in part, and the case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed one half to the appellee, Patricia Carlene Mayfield, and one half to the appellant, Phillip Harold Mayfield.

_____
JOHN W. McCLARTY, JUDGE